## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE ARREST OF | ) |
| JAMES RAMIREZ AND JOSE SOLIVAN | ) **Case No.: 17-MC-6195-MPK** |
| | ) |
| | ) |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Marc Powell, Task Force Officer ("TFO"), Drug Enforcement Administration ("DEA"), United States Department of Justice, being duly sworn, state under oath as follows:

**A. Introduction**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to sign a criminal complaint.

2.      I am a Massachusetts State Police ("MSP") Trooper and have been so since my graduation from the State Police Academy in New Braintree, Massachusetts, in April of 2005.  I am currently assigned to the Cape and Islands District Attorney's Office/Cape Cod Narcotics Task Force, where I am also a full-time Task Force Officer ("TFO") at the Drug Enforcement Agency ("DEA")/Cape Cod Task Force.  Prior to my current assignment, I was a Trooper in the South Yarmouth, Dartmouth, and Bourne Barracks.

3.      I have been in the Detective Unit for approximately 8 years.  I have assisted, initiated, and/or participated in numerous narcotics investigations that have led to arrests and convictions for violation of Massachusetts drug laws and seizure of drugs, firearms, and assets.  I have received training from the Massachusetts State Police in criminal investigations, including narcotics investigations.  I have also attended training conducted by the New England Narcotics Enforcement Officers Association.  I have also received training at several seminars for homicide

investigation and other serious and violent crimes.  In the course of my police career, I have

participated in numerous investigations involving homicide, narcotics, sexual assault, child

abuse, computer related crimes, and other felony investigations.  I have participated in numerous

search warrant executions for these investigations.

4.      Since becoming a TFO with the DEA, I have conducted numerous investigations

concerning unlawful drug possession, importation and distribution in violation of Title 21,

United States Code, Sections 841(a)(1), 843(b), 846, 952, 960 and 963, as well as the unlawful

possession and use of firearms in furtherance of drug trafficking and crimes of violence in

violation of Title 18, United States Code, Sections 924 (c), 1951, and 1959.  I have extensive

experience reviewing intercepted and recorded conversations between target subjects, amongst

others.  I also have participated in physical surveillance, the introduction of undercover agents,

the execution of search warrants, debriefings of defendants, informants and witnesses, and the

review of telephone, financial, and drug records.  Through my training and experience, I have

become familiar with the manner in which illegal drugs, including heroin, fentanyl and cocaine,

are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I

have also become familiar with the drugs themselves, and I believe that I can visually identify

substances – from their look and packaging – that I believe to be narcotics, either heroin,

fentanyl, cocaine, marijuana or oxycodone pills.

5.      The facts and information contained in this affidavit are based on my personal

knowledge as well as the observations of other law enforcement agents and officers involved in

this investigation.  All observations that were not personally made by me were related to me by

the person who made the observations.  This affidavit is not intended to include each and every

fact and matter known to the government pertaining to this investigation, but rather only facts

necessary for the establishment of probable cause for the arrest of James RAMIREZ and Jose

SOLIVAN a/k/a Kevin NUNEZ a/k/a "Keco" a/k/a Kelvin CHALES a/k/a Franklin SOTO on

August 22, 2017, for conspiracy to distribute heroin, fentanyl and cocaine, in violation of Title

21, United States Code, Section 846.

### B. Overview of RAMIREZ and "KECO"

6.      Fentanyl is a very potent narcotic, and it is classified as a Schedule II controlled

substance under the Controlled Substance Act.  Likewise, heroin is similar to fentanyl, in that it

is an opiate, and it is classified as a Schedule I controlled substance under the Controlled

Substance Act.  Cocaine is also a Schedule II controlled substance.  I know from my training and

experience that amounts over ½ to 1 gram of a mixture and substance containing fentanyl/heroin

or cocaine are likely for distribution as opposed to for personal use.

7.      James RAMIREZ, born in 1962, maintains multiple residences, including one at 5

Everett Avenue, Apt. 1, Boston, MA.  Investigators have conducted a lengthy investigation into

RAMIREZ's narcotics trafficking – primarily through Title III wiretap interceptions – and have

determined that RAMIREZ is a large-scale narcotics supplier to multiple individuals, including

Alex and Kevin FRAGA of Cape Cod, Massachusetts.  Alex and Kevin FRAGA were arrested in

Hyannis, MA on or about August 16, 2017 in possession of large quantities of heroin, fentanyl

and cocaine.  *See* Criminal Complaint filed at 17-MJ-2280.

8.      Jose SOLIVAN a/k/a Kevin NUNEZ a/k/a "KECO" a/k/a Kelvin CHALES a/k/a

Franklin SOTO was intercepted over a T-III wiretap in July and August 2017 coordinating drug

transactions with RAMIREZ.  SOLIVAN is believed to be a citizen of the Dominican Republic,

and investigators believe that he was born in 1977.  SOLIVAN controlled Apartment 8 located at

10 Abbotsford Street in Boston, MA, and pursuant to a federal search warrant executed on

August 22, 2017, investigators found and arrested SOLIVAN inside the apartment, together with

3

a large quantity of heroin.

### C. James RAMIREZ conspired with KECO and others to distribute large quantities of narcotics.

9.       Both before and during the Title III wiretap interceptions, investigators conducted

three controlled purchases of pills from RAMIREZ.  Two of the purchases occurred in June

2017, and the third purchase occurred in July 2017.  Each time, the cooperating witness

purchased 100 pills.  The pills have been tested by the DEA lab, which determined that they

were fentanyl pills designed to look like oxycodone pills.  Each 100-pack of pills contained

approximately 10 grams of fentanyl.  Two of the controlled purchases occurred at 5 Everett

Avenue, Apt. 1 in Boston, MA, and the third occurred at 112 Adams Street in Boston, MA.  All

three purchases were heavily surveilled by investigators, and during the third purchase, the

witness wore a recording device.  These purchases helped investigators confirm that RAMIREZ

is a large-scale narcotics trafficker.  In addition, as set forth below, RAMIREZ distributed large

quantities of narcotics to Kevin FRAGA and Alex FRAGA, both of whom live on Cape Cod.

10.       Wiretaps of RAMIREZ's two telephones lasted from approximately early July

2017 through August 22, 2017.  These wiretaps showed consistent drug trafficking by

RAMIREZ, who worked together with KECO to distribute narcotics.

RAMIREZ arranged a delivery of narcotics to Kevin FRAGA on July 7-8.

11.       As set forth below, investigators believe that on July 8, 2017, RAMIREZ

delivered a kilogram of narcotics as well as fentanyl pills to Kevin FRAGA on Cape Cod.

Investigators believe that RAMIREZ coordinated this delivery with multiple other co-

conspirators, including KECO, who used telephone number 857-540-8753.

12.       The order to intercept RAMIREZ's TARGET TELEPHONES 5 and 6 was issued

by District Judge Judge Saylor on July 5, 2017.  Interceptions commenced on July 7, 2017.  That

4

evening, at approximately 9:23 p.m., RAMIREZ's TARGET TELEPHONE 6 called 617-319-0305. In the call, RAMIREZ asked co-conspirator 1 ("CC-1"), "What happened, Santiago? Did they come?" CC-1 replied, "No they didn't. I am waiting here." RAMIREZ and CC-1 then confirmed that neither of them had received a call from the unnamed individual. RAMIREZ continued on, "He told me that he was going to go up there and come back to bring that." CC-1 clarified, "Oh to Lawrence" in reference to RAMIREZ's "up there," and RAMIREZ agreed. RAMIREZ then told CC-1, "Let me call him and I will call you back." Immediately after this call, RAMIREZ's TARGET TELEPHONE 6 called 646-944-5527. This call quickly ended, but a few seconds later, RAMIREZ received an incoming call from 646-944-5527. During the call, the male on the phone told RAMIREZ, "They have not told me yet." RAMIREZ responded, "Okay then, I'm going to go with someone else for 33." The male agreed, stating, "Okay, go ahead." As set forth below, I believe that RAMIREZ had been trying to secure narcotics from the user of 646-944-5527, who will be known as co-conspirator 2 ("CC-2"), but when that failed, he acquired narcotics from a different distributor.

13.    Investigators believe that RAMIREZ and CC-1, when they discussed an individual bringing back something from Lawrence, were waiting to hear from CC-2 about a previously discussed narcotics transaction. I believe that because immediately after the call between RAMIREZ and CC-1, RAMIREZ called CC-2. During the call with CC-2, CC-2 told RAMIREZ, "they have not told me yet," meaning, I believe, that CC-2 had not yet acquired the narcotics. I believe that RAMIREZ's reply, "Ok then, I'm going to with someone else for 33," meant that he was going to obtain narcotics from someone else for the price of "33." Based on my training and experience, I believe that the reference to "33" was the reference to a price of a kilogram of narcotics – cocaine or fentanyl. Here, because I believe that the kilogram was

ultimately destined for Kevin FRAGA, a heroin/fentanyl dealer, I believe that the reference was
to fentanyl ($33,000 a kilogram).

14.     Directly after getting off the phone with CC-2, RAMIREZ placed a phone call to
617-415-6962, as used by co-conspirator 3 (CC-3).  In this call, RAMIREZ told CC-3, "Why
don't you send that to me so I can go early so I don't have to go there twice.  You know how that
is."  CC-3 asked, "Like what time?"  RAMIREZ replied, "Bring it tonight so I can go take it
there tomorrow and bring the money back to you."  CC-3 could not bring "it" that evening; but
he said he would come "in the morning."  Given that this call occurred directly after the above-
noted call with CC-2, I believe that RAMIREZ called CC-3 to arrange for the delivery of the
kilogram of narcotics at "33."  In addition, when RAMIREZ stated that he was going to "go take
it there tomorrow," I believe that this is a reference to delivering the kilogram to Kevin FRAGA,
as the next day, as set forth herein, RAMIREZ met with Kevin FRAGA on Cape Cod.

15.     After ending the call with CC-3, RAMIREZ used TARGET TELEPHONE 6 to
place a call to a male named KECO, who uses telephone number 857-540-8753.  In the
telephone call, which took place at 9:30 p.m., RAMIREZ told KECO that he had to see "the two
'muchachas'" and then clarified "the two white ones."  KECO replied, "Is that right?" and
RAMIREZ stated, "Yes, so and see if I'll stop by with them in the morning."  KECO responded,
"We will do it tomorrow morning."  Based on my training and experience, I believe that
RAMIREZ and KECO work together to distribute narcotics.  Once RAMIREZ learned from CC-
3 that he would be receiving narcotics, he then called his co-conspirator, KECO, to discuss the
delivery of those same narcotics.  Based on information obtained the next day, I believe that
RAMIREZ and KECO possibly share or use the same drug stash house.

16.     The next morning (July 8, 2017), at approximately 9:07 a.m., RAMIREZ called

6

857-540-8753 (KECO).  During the call, RAMIREZ told KECO, "I am almost there."  GPS E-911 data for RAMIREZ's TARGET TELEPHONE 6 placed TARGET TELEPHONE 6 earlier that morning in the area of Clifford Street and Blue Hill Avenue in Roxbury, MA,.  Later, at approximately the time of the telephone call between KECO and RAMIREZ, the phone had moved to the area near Walnut Street and Abbotsford Street, which is near 10 Abbotsford Street, Apt. 8 (Boston), the home of KECO.  Accordingly, based on the call and the GPS data, I believe that RAMIREZ was travelling to meet with KECO to facilitate the narcotics transaction they had discussed the night before.

17.     At approximately 9:07 a.m., RAMIREZ called Kevin FRAGA, who was using 508-815-7330.  This number is referred to hereinafter as TARGET TELEPHONE 7.  This telephone call was not answered by Kevin FRAGA, but in the background, before the call disconnected, RAMIREZ could be heard saying, "I have a hide in this jeep but the pills do not fit … that thing is very little, just one fits."  KECO, who apparently was with RAMIREZ at this time, can be heard stating, "Split it in two."  Based on the prior calls with KECO, investigators recognize KECO's voice and believe that RAMIREZ was speaking with KECO at that time.  As set forth above, RAMIREZ sells fentanyl pills to drug customers, and when RAMIREZ saying that his "hide" is "very little" and "just one fits," I believe that he meant that the trap or hide he had in his car (hidden compartment) was small and only one kilogram of narcotics can fit inside the hide.  KECO's suggestion, "split it in two" was a suggestion that RAMIREZ should split the kilogram into two parts in order to fit it inside the hide.

18.     At 9:42 a.m., RAMIREZ'S TARGET TELEPHONE 6 placed a telephone call to KECO on 857-540-8753.  Given that RAMIREZ was calling KECO, I believe that the two were no longer together, and GPS E-911 location information for RAMIREZ's telephones showed that

he was no longer near KECO's home at 10 Abbotsford.  In this call, KECO asked, "Why didn't [you] bring any cut, Jimmy?" referring, I believe, to a mix ("cut") that drug dealers add to their narcotics to increase their profit margins.  When RAMIREZ replied, "No," KECO continued, "No because I have not added because you told me that you were going to bring the stuff." RAMIREZ responded, "No I did not take it, I have some, but I did not take it ... from his." KECO then stated, "200, then, you told me?" to which RAMIREZ stated, "That has to be completed; you know how is that."  KECO stated, "Yes, okay" and RAMIRZ replied, "a little extra should be added."  KECO said, "so I will add it to the Bolo's one," and RAMIREZ responded, "Yes, check it out, that is whole and nothing is missing."   Based upon my training and experience, as well as my knowledge of the investigation, I believe that RAMIREZ had received two kilograms of narcotics, one for Kevin FRAGA and one for a person named "Bolo." RAMIREZ was not adding cut to the kilogram destined for Kevin FRAGA ("I did not take it ... from his"), but "a little extra" cut needed to be added to the kilogram destined for "Bolo." RAMIREZ then stated he would re-join KECO at that time.

19.     Approximately 15 minutes later, at 9:57 a.m., GPS E-911 information for RAMIREZ's telephones placed the phones near KECO's home at 10 Abbotsford Street, Boston, MA.  The telephones remained in this area for approximately 90 minutes, after which, RAMIREZ drove to meet Kevin FRAGA.  From these factors, I believe that KECO and RAMIREZ mixed and packaged narcotics at 10 Abbotsford Street, the home of KECO. RAMIREZ then took these narcotics to Kevin FRAGA on Cape Cod.

20.     In that regard, at approximately 10:00 a.m. on July 8, 2017, shortly after RAMIREZ had rejoined KECO at or around 10 Abbotsford, RAMIREZ called Kevin FRAGA. Before the call connected, RAMIREZ and KECO were overheard discussing the vehicle (Jeep)

RAMIREZ was driving. KECO asked, "and the thing you had the other day?" referring, I believe to a Honda Pilot investigators had previously seen RAMIREZ drive. RAMIREZ stated that he was now using the Jeep because the Pilot had been "stopped about seven times." Kevin FRAGA then picked up the phone and RAMIREZ told him, "I'm about to leave now." RAMIREZ continued on, telling Kevin FRAGA, "I'll bring that ... to leave, yeah, that's fine." RAMIREZ then stated, "The number is at 3-8," to which Kevin FRAGA stated, "Oh, J, don't do that to me either." RAMIREZ replied, "Well, that's not 4-0." Kevin FRAGA said, "I thought you can meet me in the middle like last time," to which RAMIREZ countered, "we did the 3-7 ... because it was three." Based on my training and experience, I believe that RAMIREZ was now making plans to deliver the kilogram of narcotics to Kevin FRAGA. Kevin FRAGA and RAMIREZ then haggled over the price, with RAMIREZ asking for $38,000 and Kevin FRAGA countering with $37,000. RAMIREZ responded, I believe, that he only gave the prior price of $37,000 because Kevin FRAGA had received "three," referring to three kilograms of narcotics, most likely heroin or fentanyl. Further, given that RAMIREZ was paying $33,000 for the kilogram of narcotics, I believe that RAMIREZ was planning to make a profit of $5,000 by delivering this kilogram to Kevin FRAGA.

21.     Later that same day, investigators conducted electronic surveillance in order to observe a potential meeting between Kevin FRAGA and RAMIREZ. At approximately 12:44 p.m., Kevin FRAGA was seen arriving at 45 Murphy Rd. in Hyannis. Kevin FRAGA was driving the Jeep Cherokee. Kevin FRAGA then walked around the outside of the residence. At approximately 1:07 p.m., a second black Jeep Cherokee arrived at 45 Murphy Rd in Hyannis. RAMIREZ was the sole occupant of this vehicle, and he had come directly from KECO's residence. At approximately 1:21 p.m., both Kevin FRAGA and RAMIREZ entered a

9

Winnebago parked in the backyard of 45 Murphy Road. Kevin FRAGA carried with him a tan

backpack. At approximately 1:37 p.m., both Kevin FRAGA and RAMIREZ left the Winnebago

and RAMIREZ returned to his vehicle and drove away. Kevin FRAGA then went back inside

the Winnebago. Based on the previous calls and observations, I believe that RAMIREZ

delivered the kilogram of narcotics referenced in the earlier calls to Kevin FRAGA. I further

believe, based on what RAMIREZ and Kevin FRAGA both sell, as well as the price of the

narcotics, that this was a kilogram of fentanyl. In addition, as described herein, I also believe that

RAMIREZ supplied Kevin FRAGA with approximately 1,000 fentanyl pills.

22.     At 1:53 p.m., RAMIREZ received an incoming call from 617-415-6962. As set

forth above, this phone is used by CC-3. In this call, CC-3 told RAMIREZ to meet him at the

Dedham Mall as he drove home to Dorchester. GPS E-911 pings later show RAMIREZ in

Dedham. I believe that RAMIREZ was delivering money to CC-3 because in a call the previous

evening, at approximately 9:27 p.m., RAMIREZ had told CC-3 that he would "take it there

tomorrow and bring the money back to you." Based on RAMIREZ's delivery to Kevin FRAGA,

I believe that RAMIREZ now had the money and was set to deliver the money to CC-3.

23.     Two days later, on July 10, 2017, at 4:15 p.m., RAMIREZ called Kevin FRAGA.

In the call, Kevin FRAGA stated, "Oh, wanted to call you my man…my people called me on

those…you remember the little things that you gave me?" Given that RAMIREZ sells fentanyl

pills, I believe that the reference to "the little things" was a reference to previously provided

fentanyl pills. I further believe that in addition to the kilogram of fentanyl, I believe that

RAMIREZ had brought with him fentanyl pills that he provided to Kevin FRAGA. I believe that

because RAMIREZ had mentioned to KECO before RAMIREZ met with Kevin FRAGA that the

trap was too small to fit both the kilogram and the pills; KECO, however, suggested that

RAMIREZ break up the kilogram into two pieces. Kevin FRAGA then stated that his

distributors ("my people") have called him to tell him that "they are weaker." RAMIREZ

replied, "I haven't heard of any complaints down at this end." RAMIREZ, however, told Kevin

FRAGA that "we will switch them out," meaning that they would exchange the weak pills with

pills that contain a stronger dose of fentanyl. RAMIREZ confirmed with Kevin FRAGA during

the call that FRAGA had already sold or distributed approximately half the pills ("got rid of

half").

24.    In a call later that evening, investigators learned that RAMIREZ had supplied

Kevin FRAGA with approximately 1,000 pills. In that regard, on July 10, 2017, at 10:23 pm,

RAMIREZ called CC-1. In this call, RAMIREZ told CC-1 that the pills he had delivered to

Kevin FRAGA were weak. Specifically, RAMIREZ stated that "someone is complaining about

the stuff being lower...than the previous ones." RAMIREZ then explained that "they" (a

reference to Kevin FRAGA) will "return about 1,000 because they were not the same." Based

on the previous intercepted communications with Kevin FRAGA, in which Kevin FRAGA

indicated that he had sold approximately half of what he had received, I believe that RAMIREZ

had delivered fentanyl pills to Kevin FRAGA on July 8, 2017 in the Winnebago, with many of

those pills then being returned to RAMIREZ by Kevin FRAGA.

        July 19, 2017 meeting between RAMIREZ and Kevin FRAGA

25.    On July 19, 2017, at approximately 11:00 a.m., Kevin FRAGA called RAMIREZ.

In this call, RAMIREZ made plans to meet with Kevin FRAGA to discuss substituting 900

"weak" fentanyl pills with stronger fentanyl pills. In that regard, RAMIREZ first asked Kevin

FRAGA if he wanted him to bring the "normal 1,000." Kevin FRAGA replied that he needed

RAMIREZ to "bring 9 to switch out" because Kevin FRAGA had taken "100 out." RAMIREZ

stated that he thought it was "500," but Kevin FRAGA repeated "9," stating that he had only been able to "get rid of 100" because the pills were "mad weak." Based on my training and experience, I believe that RAMIREZ was offering to supply Kevin FRAGA with 1,000 fentanyl pills, but Kevin FRAGA only wanted 900 pills ("bring 9 to switch out"). Kevin FRAGA had only been able to sell 100 of the previously delivered pills due to the fact that the pills were not strong ("mad weak").    Kevin FRAGA then said that his "man" would probably want "5" as well, but the total would only be "9." Kevin FRAGA stated that he will "pay him for the 5" and RAMIREZ would need to return in a "couple of days" for the rest of the money. In this section of the call, I believe that Kevin FRAGA was not going to pay for the entirety of the supplied pills, but would instead only pay RAMIREZ for 500 pills.

26.    Later that afternoon, at approximately 2:23 p.m., RAMIREZ again called Kevin FRAGA. In this call, RAMIREZ asked if Kevin FRAGA could pay him the money for 500 pills that day, and Kevin FRAGA affirmed that he could. RAMIREZ ended the call by stating that he would call Kevin FRAGA once he got close to Cape Cod. In the early evening, at approximately 7:30 p.m., investigators conducting surveillance watched as Kevin FRAGA arrived at 45 Murphy Road and entered the Winnebago parked in the backyard of Murphy Road. Kevin FRAGA left at 7:44 p.m.; Kevin FRAGA got back in his Jeep and drove back to his residence at 34 Balsam Way in Yarmouthport. As described below, investigators recovered a large quantity of narcotics from the Winnebago.

27.    At approximately 8:55 p.m. that evening, RAMIREZ called Kevin FRAGA at 8:55 p.m. and told him, "I'm on my way" and that he would be there in "35 minutes" or so. At approximately 10:09 p.m., investigators watched as Kevin FRAGA's Jeep Cherokee pulled into the driveway of 45 Murphy Road in Hyannis. Approximately 15 minutes later, RAMIREZ, with

12

his girlfriend in the front passenger seat, arrived at 45 Murphy Road. RAMIREZ got out of his car and went towards the house. Approximately thirteen minute later, RAMIREZ got back in his truck and drove away. Kevin FRAGA drove back to 34 Balsam Way in Yarmouthport shortly thereafter.

28.      Based on these calls and text messages, I believe that RAMIREZ supplied Kevin FRAGA with approximately 500 fentanyl pills.

### On July 23, 2017, RAMIREZ collected drug proceeds from Kevin FRAGA

29.      On approximately July 21, 2017, investigators learned that RAMIREZ's aunt was dying and that he would be travelling to the Dominican Republic on July 23, 2017, to see her before she passed away. Prior to leaving for the Dominican Republic, RAMIREZ drove to Cape Cod to meet Kevin FRAGA and collect drug proceeds from Kevin FRAGA. RAMIREZ left for the Dominican Republic at noon on July 23, 2017, and he returned on August 10, 2017.

30.      At 4:03 p.m. on July 22, 2017, RAMIREZ called Kevin FRAGA. In this telephone call, investigators believe that RAMIREZ and Kevin FRAGA made a plan to meet that evening to exchange money and narcotics.

> RAMIREZ: Remember I was gonna come up on Friday? I need to come up there.
>
> Kevin FRAGA: Yeah, yo! What? This Friday?
>
> RAMIREZ: Yeah, you told me your brother was gonna grab some, and you said to come up in a couple of days, and we said Friday.
>
> Kevin FRAGA: Yeah, yeah, um, 'cause I wanted you to, might as well pick up the car too, and I'll give you … he gave me … the kid gave me the money for half of it and I still got the other half.

31.      In this portion of the call, I believe that RAMIREZ and Kevin FRAGA were making plans on when to meet, and the purpose of the meeting was both to collect money ("the kid gave me the money for half of it") and for RAMIREZ to supply narcotics for Kevin FRAGA

on behalf of one Kevin FRAGA's brother Alex FRAGA ("your brother was gonna grab some").
The call continued.

> RAMIREZ: I need that.  I gotta go to DR [Dominican Republic] for a couple of days.  My aunt is dying … my sister.  Do you remember Emili? Yeah, it's her mother, she is my mother's sister.  She got a stroke and she's dying and I gotta go over there 'cause my sister can't go.
>
> Kevin FRAGA: Mm-hmmm.
>
> RAMIREZ: So I'm gonna leave in the morning, and I need some mula.
>
> Kevin FRAGA: Oh, so are you gonna be able to take that car or not?
>
> RAMIREZ: Uhm, well I could take, uhm…
>
> Kevin FRAGA: And then when you come back.  How long as you gonna be up there?
>
> RAMIREZ: No, I'm not gonna be that long, maybe a week or less.
>
> Kevin FRAGA: Uhm …
>
> RAMIREZ: Unless you wanna wait until after I come back, they could do that work while I'm gone.

32.     In this portion of the call, I believe that RAMIREZ was informing Kevin FRAGA

that he needed to go to the Dominican Republic for approximately one week and that he needed

to collect money ("mula") from Kevin FRAGA prior to doing so.  The call continued.

> Kevin FRAGA: Yeah, umm…
>
> RAMIREZ: What do you think?
>
> Kevin FRAGA: When do you plan on coming down?
>
> RAMIREZ: Now.
>
> Kevin FRAGA: Oh, now?
>
> RAMIREZ: Yeah, I'm wanna to start driving over there in the next few minutes if possible.

Kevin FRAGA: Alright, James, let me call you back because I'm gonna try have him drop it off over there. Let me call you back in like half hour.

RAMIREZ: Alright, do you want anything more of them things?

Kevin FRAGA: I don't have money for it, but if you don't feel comfortable keeping it with you, you keep it with me. But, I could only give you money for half of them, and I still owe you for the other half.

RAMREZ: I know, I could bring you another half or even a whole.

Kevin FRAGA: It's up to you James, it's all up to you, but …

33.    In this final section of the call, I believe that Kevin FRAGA and RAMIREZ made plans to meet later that evening so that RAMIREZ could collect money from Kevin FRAGA. RAMIREZ also offered to provide Kevin FRAGA with more fentanyl, either a half kilogram of fentanyl or a whole kilogram of fentanyl ("I could bring you another half or even a whole.").

34.    At 6:08 p.m. that same day, investigators intercepted a second call between Kevin FRAGA and RAMIREZ. In this call, RAMIREZ told Kevin FRAGA that he would meet him in 15 to 20 minutes. Investigators conducting electronic surveillance via pole camera then watched as Kevin FRAGA left his home at 34 Balsam Way in Yarmouthport and drove away in his Jeep Cherokee. Other investigators watched as Kevin FRAGA drove to 45 Murphy Road in Hyannis, which is the home of Ronaldo FRAGA. Shortly thereafter, at 6:28 p.m., RAMIREZ, driving an F-150, drove to 45 Murphy Road in Hyannis. RAMIREZ got out of his car and walked towards 45 Murphy Road. Approximately eight minutes later, RAMIREZ got back inside his car and drove away. Four minutes later, Kevin FRAGA got back inside his Jeep Cherokee and drove to his home located at 34 Balsam Way. Kevin FRAGA arrived back at 34 Balsam Way at 6:45 p.m. Investigators believe that Kevin FRAGA and RAMIREZ met to exchange money and possibly resupply Kevin FRAGA with additional narcotics.

35.    Later that evening, RAMIREZ received a telephone call from CC-1. In this

15

telephone call, CC-1 and RAMIREZ discussed the quality of the fentanyl pills ("buttons") that RAMIREZ had been selling. RAMIREZ stated, "And what about that shit, the buttons"? CC-1 replied, "Well, that they need to come to pick up their garbage." RAMIREZ stated, "No but that they swap it, they don't have anything to swap it for," meaning that the pill recipients wanted to trade the pills for higher quality pills.

### Upon his return from the Dominican Republic, RAMIREZ met with Kevin FRAGA.

36.     On August 10, 2017, RAMIREZ returned from the Dominican Republic and landed in Miami. RAMIREZ stayed in Miami for a few days before returning to Boston. When RAMIREZ returned to Boston, he began communicating with Kevin FRAGA using his girlfriend's phone. This culminated in a drug deal on August 16, 2017.

37.     On August 16, 2017, at approximately 1:41 p.m., Kevin FRAGA arrived at 45 Murphy Road. Kevin FRAGA was driving the Jeep Cherokee. Kevin FRAGA was not carrying a bag when he went into the Winnebago. Kevin FRAGA was in the Winnebago for approximately 30 minutes. When Kevin FRAGA left the Winnebago, he was carrying with him a bag. Kevin FRAGA drove the Jeep Cherokee directly to the Best Western and arrived there at 2:38 p.m. Kevin FRAGA checked into Room 214 at the Best Western. I know from my training and experience that it is common for drug dealers to use hotels on Cape Cod to sell drugs.

38.     At 3:18 p.m., Kevin FRAGA left the Best Western (no bag with him) and drove directly to his home in Yarmouthport. Shortly after leaving the hotel, Kevin FRAGA was in contact with RAMIREZ. Kevin FRAGA stayed at his home until late afternoon, at which point he drove directly back to the Best Western Hotel. Prior to leaving, Kevin FRAGA called RAMIREZ, and this call lasted for one minute and 22 seconds.

39.     Shortly thereafter, Kevin FRAGA left the Best Western Hotel and travelled to 45

16

Murphy in Hyannis.  RAMIREZ had arrived at 45 Murphy at approximately 8:20 p.m.  Kevin

FRAGA arrived there at approximately 8:30 p.m.  Investigators conducting electronic

surveillance watched as, at approximately 8:42 p.m., investigators saw flashlights move towards

the Winnebago.  Based on who had arrived at 45 Murphy Road, investigators believe that Kevin

FRAGA and RAMIREZ went into the Winnebago together.  At approximately 9:10 p.m.,

RAMIREZ left 45 Murphy Road and drove away, heading back to Boston.  At approximately

9:15 p.m., Kevin FRAGA left, got into the black Jeep Cherokee and began driving back away.

Kevin FRAGA then drove back to 45 Murphy Road, stayed for a few minutes, and then drove

away again.

40.     Investigators effected a traffic stop of Kevin FRAGA's Jeep Cherokee (9:25

p.m.).  Investigators then obtained federal search warrants for the Winnebago, Kevin FRAGA's

room at the Best Western, and the home that Kevin and Alex FRAGA share in Yarmouthport.

These search warrants were issued by Magistrate Judge Marianne B. Bowler on August 17, 2017

at approximately 1:18 a.m.  The following narcotics were found inside these locations:

    a.  Winnebago: Hidden inside a "trap" was approximately three kilograms of heroin, additional fentanyl pills, and a firearm.

    b.  Room 214 of the Best Western Hotel in Hyannis: investigators searched the room and discovered a second bag that contained a tan powder, as well as a digital scale and "cutting" agent.  Based on my training and experience, including the appearance, color, texture, and packaging of the substance, I believe that this second bag contained a mix of fentanyl and heroin.  The second bag weighed approximately 87 grams, and the remainder of the cocaine weighed approximately 59 grams.

    c.  Home of Alex and Kevin FRAGA: Investigators searched a bedroom that investigators believe belonged to A-FRAGA due to paperwork found inside the room.  Inside the bedroom investigators found a bag containing a tan powder that, based on the appearance, color, texture, and packaging of the substance, investigators believe contained a mixture of heroin and fentanyl.  A digital scale was also found in the room, and this bag of suspected narcotics weighed approximately 30 grams.

17

d. Kevin FRAGA's black Jeep: Investigators located a "hide" on the backside of the front passenger seat of the Jeep. Inside this hide, investigators located a bag containing a chunk of a hard-packed brown powder that, based on the appearance, color, texture, and packaging of the substance, I believe contains a mixture of heroin and fentanyl. This powder, with packaging, had a weight of approximately 165 grams. A second package in the hide contained a lump of off-white powder that, based on the appearance, color, texture, and packaging of the substance, I believe contained fentanyl. This second package had a combined weight, with packaging, of 136 grams. In addition, there were approximately 200 pills that I believe were made to mimic the look of oxycodone. However, based on a prior controlled purchase, together with the appearance, color, texture, and packaging of the pills, investigators believe that these were fentanyl pills. A third smaller bag contained a brown powdery substance that weighed approximately 25 grams. I believe that this bag contained a mixture of heroin and fentanyl. There was a fourth bag containing white powder that weighed approximately three grams. Finally, investigators discovered a stack of United States currency wrapped in a rubber band inside the hide.

41.     As set forth above, investigators believe that the recovered narcotics were delivered to Kevin FRAGA and Alex FRAGA by RAMIREZ.

RAMIREZ arranged to bring narcotics to Kevin FRAGA on August 22, 2017.

42.     After returning from meeting with Kevin FRAGA on Cape Cod, RAMIREZ continued to arrange additional narcotics transactions. It further became evident to investigators that RAMIREZ was storing narcotics at 5 Everett Avenue, Apt. 1, which is an apartment that he owns. Investigators had intercepted numerous calls where RAMIREZ described the apartment as being his, and further, he acknowledged storing narcotics in this apartment. As an example, on August 19, 2017 at 8:21 p.m., RAMIREZ called his sister Emilia. Emilia also lives at 5 Everett Avenue, Apt. 1 in Dorchester, MA. In the call, RAMIREZ asked Emilia where she had put the "half," referring, I believe to a half kilogram of fentanyl/heroin. Emilia replied that she had put it "in the sofa, stick your hand in the back rest." Later in the call, RAMIREZ askedEmilia, "how many are left there," and Emilia responded, "there are a lot left, James." RAMIREZ asked, "Like 600?" and Emilia stated, "I believe so, something like that or perhaps

more. Yes, more or less." RAMIREZ responded, "They are not in little packages of 100?" and Emilia responded, "Yes, yes but there's one that is open, the last one that I used." Based on my training and experience with the case, as well as based on the seizure of narcotics effected on August 22, 2017, I believe that RAMIREZ was referring to 600 fentanyl pills, and that these pills were stored in 5 Everett Avenue, Apt. 1.

43.     In addition, I believe that RAMIREZ attempted to bring additional narcotics to Kevin FRAGA. At approximately 8:10 p.m. on August 21, 2017, Kevin FRAGA spoke with RAMIREZ on the telephone. In the call, K-FRAGA stated that he was "ready" for the "three." RAMIREZ replied "ok," and they made plans to do the deal the next day. Investigators believe that Kevin FRAGA was making plans to obtain three kilograms of heroin/fentanyl from RAMIREZ. Approximately 30 minutes later, at 8:39 p.m. on August 21, 2017, RAMIREZ called CC-3. As set forth above, investigators believe that CC-3 supplies RAMIREZ with narcotics. In the call, RAMIREZ asked CC-3 for three "white women," referring, I believe to three kilograms of fentanyl or cocaine. RAMIREZ stated that he would "take them like that," and CC-3 stated that he would "call" and "ask" about securing the narcotics. Approximately 10 minutes later, CC-3 called RAMIREZ. In the call, CC-3 stated that it would "be better" for his supplier to "lower half a point" and provide "two and a half." RAMIREZ replied, "I will do it like that."

44.     From this call, investigators believe that CC-3 was able to secure two and a half kilograms of narcotics, either fentanyl or cocaine. RAMIREZ then attempted on multiple occasions to reach K-FRAGA late in the evening of August 21, 2017. The next morning, on August 22, 2017, investigators saw on the T-III that RAMIREZ placed approximately 15 calls to KECO on 857-540-8753. KECO did not answer these calls. Investigators conducting

19

surveillance then watched as RAMIREZ, together with his girlfriend, began driving down to Cape Cod in a Ford F-150.

45.     Investigators conducted a traffic stop of the Ford F-150. From RAMIREZ's girlfriend, investigators recovered approximately 100 pills that I believe contain fentanyl. No other narcotics were found in the vehicle. Accordingly, investigators believe that RAMIREZ was coming to Cape Cod to collect money from Kevin FRAGA before providing him with the three kilograms of narcotics. At approximately this same time, investigators obtained federal search warrants to search KECO's residence (10 Abbotsford Street, Apt. 8, Boston, MA) and RAMIREZ's residences (5 Everett Avenue, Apt. 1 and 112 Adams Street in Boston).

46.     On August 22, 2017 at approximately 4:00 p.m., investigators made entry into Apartment 8 of 10 Abbotsford Street in Boston, MA. Inside the two-bedroom apartment, investigators located a male later identified as KECO. No one else was inside the apartment. Investigators detained KECO while proceeding to conduct a search of the apartment. Investigators asked the male if he was "KECO." The male stated that he was not KECO, rather, the male insisted, KCO had just left. Investigators, however, had been conducting surveillance outside the apartment building for more than five hours, and had not seen anyone leave the building.

47.     The male identified the bedroom in the apartment that he claimed to be his. A DEA Agent then placed a phone call using a blocked number to 857-540-8753, which is the phone intercepted on the wiretap that was used by KECO. Inside the bedroom the male identified as his, a telephone began ringing and the caller ID showed a blocked number. This indicates to me that KECO's phone was ringing inside the male's bedroom. The male identified that phone as belonging to him, which leads me to believe that the male inside the Apartment

was KECO.  In addition, investigators took a photograph of KECO and sent it, via text message, to other investigators.  Those investigators showed the photograph to a person who has interacted with KECO on multiple occasions.  Investigators asked that person if he/she recognized the photo.  That person immediately and without prompting identified the photo as being of KECO. The male presented investigators with an identification from the Dominican Republic in the name of "Franklin Soto."  In the apartment, investigators found a second Dominican Republic identification bearing a different name with the same photograph, and in KECO's vehicle parked outside the apartment building, investigators found, within a "hide," a third Dominican identification bearing that same photograph but with a different name.

48.     Inside the bedroom SOLIVAN identified as belonging to him was an open safe. Inside the safe was a plastic baggie containing a brown powder that I believe, from my training and experience as well as my familiarity with the look and packaging of heroin, to be heroin.  A scale was resting on top of the safe, and investigators weighed the powder, which weighed approximately 52 grams.  In the second bedroom, investigators located a can of WD-40 lubricant.  That can had a false bottom and inside the false bottom was a second baggie of brown powder that weighed 12 grams.  Based on my training and experience, as well as my familiarity with the look and packaging of heroin, I believe this substance to be heroin as well.

49.     Also inside the apartment was a "20-ton" press.  This press, which was very heavy, appeared to be a press used to package kilograms or bricks of narcotics for further re-sale. Investigators also located two containers of narcotics cutting agents – one colored white and one colored brown.  Investigators have identified multiple names for the male identified as KECO. The name on KECO's Dominican identification is Franklin Soto.  Investigators also sent a subpoena to the National Grid utility company for KECO's apartment (Apt. 8, 10 Abbotsford

Street), and the listed name on the utilities is Jose SOLIVAN.  Investigators further searched

their NCIC database for Jose SOLIVAN, and that database returned known aliases for

SOLIVAN as being Kelvin CHALES and Kevin NUNEZ.

50.     At approximately 4:30 p.m. that same day, investigators searched RAMIREZ's

apartment, located at 5 Everett Avenue, Apt. 1 in Boston, MA.  Investigators searched

Apartment 1 – a small one-bedroom apartment – and the Basement.  No resident of the

apartment was home at the time of the search.  Inside the couch, as referenced in the above-noted

call where RAMIREZ asked his sister how many pills were left in the couch, investigators found

approximately 1,300 pills.  Based on my training and experience, and my knowledge of the case

where we had previously purchased fentanyl pills from RAMIREZ, I believe that these are

fentanyl pills designed to look like oxycodone.  Lab reports show that each 100-pill quantity

contains approximately 10 grams of fentanyl.  Accordingly, I believe that the 1,300 pills

contained approximately 130 grams of fentanyl.  In addition, investigators located significant

quantities of indicia and mail with RAMIREZ's name and address on it inside the apartment as

well as passports in RAMIREZ's name.  In the apartment's bathroom, investigators located a

small plastic baggie containing a white powder.  This powder was not field tested.  In the

basement, investigators located an envelope inside a computer bag.  This computer bag

contained indicia with RAMIREZ's name on it.  Inside the envelope were 10 to 12 additional

fentanyl pills.  Finally, investigators recovered a "kilo press" in the basement.  Based on my

training and experience, I believe that this press is used to package large volumes of narcotics for

further distribution.

51.     Based on the facts set forth above, I have probable cause to believe that

RAMIREZ and KECO engaged in a conspiracy to distribute and possess with the intent to

distribute narcotics, namely, heroin, fentanyl and cocaine, in violation of Title 21, United States

Code, Section 846.

MARK POWELL
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to me this the 23rd day of
August 2017

HON. M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts