UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 17-10330-RGS

UNITED STATES OF AMERICA

v.

KELVIN CHALAS

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

August 4, 2020

STEARNS, D.J.

Defendant Kelvin Chalas is charged in a two-count indictment with conspiracy to distribute cocaine and fentanyl and possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841. He seeks now to suppress evidence seized from his home, Apartment 8, 10 Abbotsford Street, in Roxbury, Massachusetts. The search was conducted pursuant to a warrant issued by a United States Magistrate Judge. Chalas's principal argument is that the warrant issued on stale information and failed to establish probable cause that drugs would be found in his home at the time the warrant was executed. After two hearings on the motion, for the reasons to be stated, suppression of the evidence seized from the home will

be allowed.[1]  A second motion challenges the validity of Title III wiretap warrants issued to intercept the communications of two brothers, Kevin Fraga and Alex Fraga, alleged Cape Cod drug dealers, and a third man, James Ramirez, alleged to be their principal supplier.  Chalas, using the moniker "Keco," was caught on one conversation during the seven-week duration of the wiretaps.  For reasons that need only briefly be explained, the motion to suppress the wiretap evidence will be denied.

## LEGAL FRAMEWORK

In the law of search and seizure there is a strong preference for the "informed and deliberate determinations of magistrates."  *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932), *overruled on other grounds by Illinois v. Gates*, 462 U.S. 213, 238 (1983).  In recognition of this preference, courts

---

[1] The original motions to suppress were filed on November 13, 2018. The government responded with an opposition on February 22, 2019.  The court heard oral arguments on the motions on June 27, 2019, and took the motions under advisement.  On August 16, 2019, the court granted Chalas's motion to appoint new counsel (the fourth in a troubled history of Chalas's relationships with appointed counsel).  In doing so, the court stayed a decision on the motions to suppress and referred them to successor counsel to review.  On April 3, 2020, successor counsel indicated that Chalas wished to renew the motions to suppress and file a supplemental brief on the Abbotsford Street motion but was otherwise content to rely on filings by prior counsel with respect to the Title III warrants.  The government responded on April 14, 2020.  On July 8, 2020, the court held a hearing on the motions by videoconference.

reviewing warrants "will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant.'" *Aguilar v. Texas*, 378 U.S. 108, 111 (1964).  A search warrant may issue on a showing of probable cause — something more than a suspicion, but something significantly less than proof beyond a reasonable doubt.  *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009) (probable cause is a fluid concept taking its substantive content from the particular circumstances – "the best that can be said generally about the required knowledge component of probable cause . . . is that it raise a 'fair probability,' . . . or a 'substantial chance,' . . . of discovering evidence of criminal activity").[2]  With respect to the search itself, there is a two-fold dimension to the showing of probable cause.  First, a showing must be made that criminal activity is underfoot, *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999), and second, that "there is a fair probability that

---

[2] Probable cause is concerned with probabilities, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949).  Probable cause means "reasonable cause," something significantly less exacting than "more likely than not" or "by a preponderance of the evidence." *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979).

contraband or evidence of a crime will be in a particular place" at the time the warrant is executed. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

In reviewing the validity of a search warrant, a court is confined to the "four corners" of the affidavit – extrinsic evidence is not considered. *Vigeant*, 176 F.3d at 569. When the government has conducted a search or seizure pursuant to a warrant, the defendant has the burden of showing that the warrant is invalid – proof is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177-178 n.14 (1974), citing *Lego v. Twomey*, 404 U.S. 477, 488-489 (1972).

## FACTUAL BACKGROUND

The warrant was issued on August 22, 2017, and executed the same day. The warrant application was supported by an affidavit submitted by Drug Enforcement Administration Special Agent Daniel Golia. In its prefatory paragraphs, the affidavit follows a familiar pattern, setting out Agent Golia's training and experience, followed by a description of the typical behaviors and practices of persons engaged in drug trafficking and the types of incriminating evidence that can be expected to be found in their possession.

Turning to the investigation at hand, Agent Golia explained that the targets of the investigation were the two Fraga brothers and Ramirez. All

three men had been under telephone surveillance pursuant to separate but related Title III warrants. Agent Golia related that the Fraga brothers had been arrested on August 16, 2017, while in possession of large quantities of heroin, fentanyl, and cocaine. Ramirez, however, remained at large and was still under telephone surveillance.

Chalas makes his first appearance as "Keco" in paragraph 25(c) of the affidavit in connection with a request to search his Abbotsford Street apartment. It appears from the affidavit that the agents were unsure of Keco's true identity but believed that he was most likely an individual known as Kevin Nunez, also known as Jose Sollivan. The paragraph then relates that prior to delivering drugs to the Fragas on July 7-8, 2017, "Ramirez mixed and packaged these narcotics at 10 Abbottsford." Agent Golia then explained how it had been determined that Kevin Nunez occupied Apartment 9 at 10 Abbottsford Street and noted that Nunez had a lengthy criminal history "which includes convictions for felony drug trafficking."

In the following paragraphs, the affidavit details the extensive evidence of drug dealing gathered by the investigators against Ramirez and the Fragas. Keco makes his next appearance in paragraph 46 of the affidavit when, on the evening of July 7, 2017, Ramirez called a telephone number associated with Keco. Referencing "two white ones," Ramirez told Keco that he would

5

"stop by with them in the morning," and that "[w]e will do it tomorrow morning." Golia Aff. ¶ 46 [Dkt #105-1] Based on this conversation, Agent Golia believed that "Ramirez and Keco work together to distribute narcotics" and that they "possibly share or use the same drug stash house." *Id.* Ramirez called Keco early the next day to tell him that "I am almost there." *Id.* at 47.   Presumably from call site location information (CSLI), investigators determined that Ramirez had traveled to the vicinity of Abbotsford Street.   A few minutes later, Ramirez placed a call to one of the Fraga brothers. *Id.* ¶ 48.   Before hanging up, Ramirez was heard complaining that the pills would not fit in the hide in his jeep.   A voice, believed to be Keco's, is then heard suggesting that he "[s]plit it in two."   *Id.*

Ramirez (who had left Keco's apartment after dropping off the drugs), called at 9:42 a.m. to discuss adding a "cut" to dilute one of the two kilograms of the unspecified narcotic that he and Keco were mixing.   *Id.* ¶ 49. Ramirez then returned to Abbotsford Street where he stayed for 90 minutes before leaving to meet one of the Fraga brothers on Cape Cod.   *Id.* ¶ 50. "From these factors," Agent Golia "believe[d] that Keco and Ramirez mixed and packaged narcotics at 10 Abbotsford Street, the home of Keco." *Id.* ¶ 50. The next substantive mention of Keco is in paragraph 56, and the date is now August 22, 2017.   According to the affidavit, Ramirez was in the process of

6

effecting a drug purchase that he had arranged the previous day.  On the morning of August 22, Ramirez "tried on multiple times to reach Keco" on his cell, but the calls were never answered.   There is no further mention of Keco in the remaining 35 paragraphs of the affidavit, nor is Abbotsford Street mentioned in the concluding paragraphs 86-91 as one of the targeted residences used by Ramirez to conduct drug trafficking.[3]

## DISCUSSION

Police are not required to seek a warrant the moment they have information sufficient to establish probable cause.   However, "[i]t is well established that the temporal proximity or remoteness of events observed has a bearing on the validity of a warrant."   *United States v. Dauphinee,* 538 F.2d 1, 5 (1st Cir. 1976); *see also Rosencranz v. United States*, 356 F.2d 310, 315-316 n.3 (1st Cir. 1966).   In practical terms, this means that the warrant affidavit must contain information sufficiently fresh to support an inference that the items sought will still be on the targeted premises when the warrant is executed.   *Sgro v. United States*, 287 U.S. 206, 210-211 (1932).

Whether or not information is stale depends on the nature of the property to be seized, the nature of the alleged crime, and the nature of the premises to be searched.   *Andresen v. State*, 331 A.2d 78, 105 (Md. Ct. Spec.

---

[3] From the structure of the affidavit, and the non-chronological appearance of Keco in paragraph 56, it appears that Abbotsford Street was inserted as a targeted premised as something of an afterthought.

App. 1975), *aff'd, sub nom. Andresen v. Maryland*, 427 U.S. 463 (1976). "The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock." *Id.*, 331 A.2d at 106. Certain types of contraband, like child pornography amassed for a pedophile's personal gratification, tend to remain in the hands of their possessors indefinitely. *See United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012) (seven months); *Commonwealth v. Kenney*, 449 Mass. 840, 846 (2007) ("perhaps a lifetime"). Expensive marijuana cultivation equipment installed at a fixed location might reasonably support an ongoing drug operation for two or more years. *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir. 1996). A weapons collection is usually carefully curated by its owner. *United States v. Batchelder*, 824 F.2d 563, 564 (7th Cir. 1987) (illegal silencers properly seized on nine-month-old information). Drugs, on the other hand, are a fungible commodity that is typically quickly consumed or sold. *See also Commonwealth v. Fleurant*, 2 Mass. App. Ct. 250, 254-255 (1974).

A primary consideration in evaluating whether an affidavit is sufficiently "fresh" is whether it "describes a single transaction or a continuing pattern of criminal conduct." *United States v. Tucker*, 638 F.2d 1292, 1299 (5th Cir. 1981); *United States v. Nocella*, 849 F.2d 33, 39-40 (1st Cir. 1988) ("We agree with the Fifth Circuit that a 'primary consideration in

8


evaluating the staleness issue is whether the affidavit describes a single transaction or a continuing pattern of criminal conduct.'") (quoting *Tucker,* 638 F.2d at 1299).

"[With] a mere isolated violation, it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Commonwealth v. Vynorius*, 369 Mass. 17, 25 (1975). *See also United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (latest information thirty-five days old, affidavit detailed a long-term and intensive investigation); *United States v. Moscatiello*, 771 F.2d 589, 597 (1st Cir. 1985) (ongoing narcotics enterprise, year-old information updated by contemporaneous surveillance); *United States v. McElroy*, 587 F.3d 73, 78 (1st Cir. 2009) (three-year-old information regarding a payroll tax avoidance scheme refreshed by defendants' continuing withdrawals of large sums of cash).

On the other hand, a single transaction involving drugs weighs heavily on the staleness scale, particularly where the government relies on a theory of conspiracy to establish ongoing conduct. *See United States v. Izzi*, 613 F.2d 1205, 1210 (1st Cir. 1980) ("A single sale of drugs without more does not establish a conspiracy."); *United States v. DeLutis*, 722 F.2d 902, 905-906

(1st Cir, 1983) (same); *United States v. Wagner*, 989 F.2d 69, 74-75 (2d Cir. 1993) (upholding suppression of search based on six-weeks-old information and single marijuana purchase); *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) (an isolated drug sale did not support an inference of "inherently ongoing" conduct).[4]

An otherwise defective warrant may nonetheless pass muster under the so-called "good faith" exception adopted by the Supreme Court in 1984. *See United States v. Leon*, 468 U.S. 897 (1984). Justice White, the author of the majority opinion in *Leon*, began his explanation of the exception by noting the tenuous relationship between the exclusionary rule and the judicial integrity.

> First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and

---

[4] Even absent evidence of a specific series of drug transactions, reputational evidence that a defendant is an established and successful drug dealer will support an inference that he is likely to keep drugs, proceeds, and records of drug dealing in his home. *See* 2 LaFave, SEARCH AND SEIZURE, § 3.7(d) (2012); *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999). *See also United States v. Whitner*, 219 F.3d 289, 297-299 (3d Cir. 2000) (collecting cases). This principle does not apply in this case, as the government had no certain knowledge of Chalas's identity, and except for an allusion in footnote 2 to a 2016 case in which "Keco" was intercepted placing telephone calls to a Dorchester-area fentanyl dealer, no certain knowledge of his reputation for dealing in drugs.

> magistrates.  Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

*Id.* at 916.  Suggesting that the Court had "frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment," Justice White concluded that this "is particularly true . . . when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."  *Id.* at 918, 920. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."  *Id.* at 921.

Examples of "bad faith" reliance on a warrant, while not abundant, do exist.

> Suppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.  The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role . . . . Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable

>
> cause as to render official belief in its existence entirely unreasonable." Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient — *i.e.*, in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid.

*Id.* at 923 (internal citations omitted).

"Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search." *Id.* at n.24.  *See also Malley v. Briggs*, 475 U.S. 335 (1986) (officer who obtained an arrest warrant on facts that no objectively reasonable officer could have thought to have constituted probable cause could be held personally liable for civil damages); *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987) (good faith could not save a warrant the supporting affidavit of which recklessly omitted easily obtainable and critical information); *United States v. Hove,* 848 F.2d 137, 139-140 (9th Cir. 1988) (good faith could not save a warrant where the supporting affidavit lacked any evidence connecting the defendant to the premises to be searched).

ULTIMATE CONCLUSIONS OF LAW AND FACT

As portrayed in the affidavit, Chalas is in the grand scheme of the conspiracy but a bit player "*that struts and frets his hour upon the stage, and then is heard no more.*"[5] But that hour, or more accurately that day, the morning of July 7, 2017, is sufficient to make out his role as a coconspirator, however minor, of Ramirez. Conspiracy is an enveloping crime that does not distinguish big from bit players.[6] It has long been the law that the government need not show that each member of a conspirator knew of or had contact with all of the other members; nor need it show that the conspirators knew all the details of the conspiracy or participated in every act in furtherance of the conspiracy. *United States v. Mena-Robles*, 4 F.3d 1026, 1032 (1st Cir. 1993).

I do not go as far as *Izzi* and *DeLutis*, the cases on which Chalas relies, for, as applied to him, an instance of drug involvement (the mixing of drugs with Ramirez), does not establish membership in a conspiracy. In *Izzi*, there was no evidence of any involvement on Izzi's part with the conspirators other than a single meeting at which he offered to sell them drugs. *DeLutis* is to

---

[5] William Shakespeare, MACBETH, act 5, sc. 5.

[6] It may nonetheless temper the extent of a defendant's liability for the conspiracy's crimes. *See United States v. Willis*, 49 F.3d 1271, 1274 (7th Cir. 1995).

the same, or even softer effect, in that it involved a failed attempt by DeLutis to make a single purchase of drugs from the conspirators. Chalas's participation as a co-conspirator, while limited, was more sustained and substantive than that of the defendants in either of these cases. Moreover, he was obviously one of Ramirez's familiars, proffering him trusted advice on drug smuggling technique and helping him to mix and cut a substantial quantity of drugs for sale. But membership in a drug conspiracy by itself does not – and cannot - establish automatic probable cause for a search of person's home for drugs.

    Here, the evidence disclosed in the affidavit that drugs might be found in Chalas's apartment consisted of Agent Golia's speculation that Ramirez and Chalas "possibly share or use the same drug stash house," and the wiretap evidence establishing that the two men met to process drugs supplied by Ramirez at Chalas's apartment on the morning of July 7, 2017. Agent Golia's hunch that Chalas's apartment was a possible stash house is insufficient to establish probable cause as a matter of law, *see Spinelli v. United States*, 393 U.S. 410, 418 (1969), while evidence of Chalas's one-off collaboration with Ramirez in early July is insufficient as a matter of law to support the inference that drugs would be found in late August in his home. The government cites no case, nor has the court found one, where absent a

14

showing of protracted conduct or entrenched reputation, a court has sanctioned an interval of this magnitude between evidence of drugs in a person's home and probable cause to believe they would still be there six weeks later. Consequently, the motion to suppress the evidence seized on August 22, 2017, from Chalas's apartment will be allowed.

*Good Faith Exception*

Whether the good faith exception should apply (to my mind) represents a much closer question. On this issue, the burden shifts to the government to show that application of the exclusionary rule would serve no deterrent purpose. *See United States v. Diehl*, 276 F.3d 32, 42 (1st Cir. 2002), citing *Leon*, 468 U.S. at 897. The *Leon* Court cited four specific instances in which the good faith exception does not apply of which the third is relevant here: whether the affidavit supporting the warrant is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-611 (1975) (Powell, J., concurring in part)). Such affidavits are often labeled "bare bones," that is, consisting of mostly suspicions or conclusions, without making "some connection" between illegal activity and the place to be searched. *United States v. Christian*, 925 F.3d 305, 312-313 (6th Cir. 2019) (en banc); *see also Vigeant*, 176 F.3d at 571-572.

15

The case most in point (and most persuasive) on the issue of good faith is *United States v. Ward*, 2020 WL 4282161 (6th Cir. July 27, 2020). In *Ward*, the defendant was charged with drug trafficking and firearms possession based on evidence seized from his home. The affidavit supporting the search warrant for Ward's home recited undated text messages implicating Ward in a fatal sale of drugs seven months before the search took place, a trash pull the week before the search that uncovered some loose marijuana, cigar wrappers, and a plastic bag containing an unidentified residue of what police believed might be an illicit substance, and the fact that Ward had been previously charged with drug and weapons offenses. *Id.*, at *3. Citing *Hython, supra*, as the case "most similar," the Sixth Circuit noted that it did not apply the good faith exception in that case "because the affidavit did not indicate a timeframe for the events, and, more importantly here, the isolated controlled buy [in *Hython*] did not allow an inference that further drug-related evidence would be found in defendant's home, as the sale of drugs [was] not 'inherently ongoing.'" *Id.*, at *5.

In the case at hand, no reasonable officer could have believed that probable cause had been shown that drugs would be found in Chalas's home six weeks after a single instance of mixing drugs and – this is important – that had been brought to his apartment for that purpose by Ramirez (and not

16

supplied by Chalas). Finding that the government has failed to carry its burden of showing good faith is not to say that the court has implicitly found bad faith on the part of Agent Golia or the officers who assisted in executing the warrant. Chalas, as indicated, was a small piece of a much larger puzzle and it is understandable that, given the massive amount of evidence that had been amassed against Ramirez (whose two stash houses on Everett Avenue and Adams Street in Dorchester were the principal targets of the warrant), a more exacting examination of the lack of evidence suggesting that drugs would be found in his residence was not conducted.

*The Title III Warrants*

The motion to suppress the evidence gathered under the Title III warrants to intercept the telephones belonging to Ramirez on which Chalas was intercepted needs little discussion.[7] While it is true that Chalas has statutory standing to challenge the tap of Ramirez's phones, *see* 18 U.S.C. § 2518(10)(a)(1), the reason that he offers for suppressing the warrant bears no weight. Chalas argues that the July 5 warrant failed the "necessity" test

---

[7] The warrant that led to the interception of Chalas's calls with Ramirez on July 7 and 8, 2017, was issued on July 5, 2017. Chalas also challenges the reauthorization of the warrant on August 7, 2017. The reason for the challenge to the reauthorization is not clear as it did not lead to any interceptions of conversations on which Chalas was recorded. Consequently, he has no standing to prosecute the second challenge.

17

as the government had already acquired enough evidence to arrest and prosecute Ramirez for drug crimes. There is no rule that requires police to slam the brakes on an investigation at the moment they obtain probable cause for an arrest. *See, e.g., United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009) ("[T]he necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person."). Particularly in the case of drug trafficking, the government has an interest in fleshing out the entire scope and extent of the criminal syndicate under investigation and is entitled to pursue a full understanding of a drug conspiracy's operations and the extent of its distribution network without "run[ning] outlandish risks or to exhaust every conceivable alternative before seeking a wiretap." *United States v. Delima*, 886 F.3d 64, 70 (1st Cir. 2018).

## ORDER

For the foregoing reasons, the motion to suppress the evidence seized from Chalas's home is <u>ALLOWED</u>. The motion to suppress the Title III evidence is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns_____
UNITED STATES DISTRICT JUDGE